# SMITH *v.* SMITH.

---

EQUITY; DEEDS; INCOMPETENT PERSONS; FIDUCIARIES.

1. Where it is sought in equity to set aside deeds on the ground of the mental incompetency of the grantor, the question for determination is whether, at the time of their execution, the grantor possessed sufficient

intelligence to understand fully the nature and effect of each trans-
action, and, if so, whether they were executed under such circumstances
as to warrant their being upheld, or would justify the interference of
equity for their cancelation.

2. A court of equity, at the suit of the committee of a lunatic, will set
aside transfers of his property, made by the lunatic to his son, and an
agreement dissolving a partnership between them, where it appears,
from medical and other testimony, that the father, to the knowledge
of the son, was *non compos* for some time before he made the transfers,
at which time the son was transacting his father's business under a
power of attorney from him; and that in each transaction the son
benefited, and not the father.   (Following *Moran* v. *Sullivan*, 12 App.
D. C. 137, and *Holtzman* v. *Linton*, 27 App. D. C. 241.)

No. 1731.   Submitted March 21, 1907.   Decided April 2, 1907.

HEARING on an appeal by the defendants from a decree of the
Supreme Court of the District of Columbia in a suit in equity
to set aside certain transfers of property and an agreement for
dissolution of a partnership.                          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree of the supreme court of the
District of Columbia, canceling and setting aside a deed dated
May 14, 1902, conveying real estate situated in the District of
Columbia, an alleged agreement for dissolution of partnership
dated September 21, 1901, and a bill of sale dated May 15, 1902,
and referring the cause to the auditor for an accounting.   Said
deed and papers were set aside on the ground that they had been
executed by the appellee, Henry S. Smith, while he was insane.

Henry S. Smith, prior to 1895, conducted a dairy business at
No. 1211 C St. S. W., in the city of Washington, and then
owned considerable property.   In 1895 he and his son, Frank
W. Smith, the appellant herein, entered into partnership, and
together conducted the dairy business theretofore conducted by
Henry S. Smith.   This partnership continued until the execution
of said agreement for its dissolution, September 21, 1901, when
Frank succeeded to the business.   This agreement for dissolu-

tion was duly recorded by the son Frank, but in a short time thereafter, *by verbal. agreement,* the partnership was re-estab-• lished, and continued until the execution of said deed of May 14 and bill of sale of May 15, 1902. From 1895 until January, 1902, Henry S. lived with his wife, Maria L. Smith, on a farm which he owned in Loudoun county, Virginia. Said Maria L. Smith was not his first wife, and was not the mother of appellant Frank W. Smith. As early as February, 1900, Mrs. Smith noticed that there was something wrong with her husband, and had him consult a doctor; but he grew steadily worse. He had all sorts of hallucinations, among which was the belief that his wife was about to poison him. He became very much prejudiced against her. His condition grew so bad that early in January, 1902, his two sons,. Frank W..Smith and Dr. J. S. Smith, instituted proceedings at Leesburg, Virginia, looking to the appointment of a committee to take charge of his affairs. Mr. Smith objected to being adjudged *non compos mentis,* and employed counsel to represent him. In view of the mental condition of his father at the time, as testified to by Dr. West, who then examined him, Frank's testimony in respect to what occurred at this hearing is far from ingenuous, for he says: "My brother employed Mr. Janney (an attorney) *to look into my father's nervousness."* He was asked whether Mr. Janney was employed as a physician or as a lawyer, and answered, "As a lawyer." Frank was forced to admit, however, that an agreement was reached which resulted in his being given a power of attorney that he might take charge of his father's affairs. The father was then taken by Frank W. Smith and Dr. J. S. Smith to Sheppard and Pratt Hospital for the Insane, in Baltimore, Maryland. Dr. Franklin, assistant physician of that institution, testified that Mr. Smith was undoubtedly insane both when he entered the institution and when he left there, and that one of his delusions was that his wife had put poison in his food to influence him. The doctor explained that, Sheppard and Pratt Hospital being a private institution, patients are discharged upon the request of responsible friends. From this sanitorium Frank took his father to his own home, owing to his father's

prejudice against his wife. Frank soon sought to have him enter Garfield Hospital, but they declined to receive him there. Finally, however, he went back to the farm in Virginia, with his wife, and was living there on May 14 and 15, 1902, when the deed and bill of sale of those dates were executed. He subsequently, owing to the sale of the farm, came to this city to live.

Various witnesses testified as to the mental condition of Mr. Smith from prior to the execution of said dissolution of partnership, in 1901, until October, 1903, when lunacy proceedings were instituted against him in this District. The record shows that on that date he was adjudged insane, and committed to St. Elizabeth's, where he remained for some time. Frank was a witness before the jury in the lunacy proceedings, and testified that his father had been of unsound mind for several months. Other physicians who had treated Mr. Smith, and other witnesses who had known him, testified as to his mental condition and lack of capacity to transact business; but, in view of the testimony of Frank W. Smith himself and that of the attorney who prepared the papers set aside, we refrain from further analysis of the other evidence in the case.

Frank admits that in September, 1901, when the agreement for dissolution of the partnership was signed by his father, he paid his father no money, but surrendered certain notes which his father had previously given him for borrowed money. His testimony as to the consideration for these notes is vague and unsatisfactory, and the whole transaction is not free from suspicion. The dissolution agreement was duly recorded, but, when in a short time by verbal agreement the partnership was re-established and the notes redelivered to Frank, he failed to execute or record a release. So far as the record disclosed, therefore, he was the sole owner of the business.

Mr. Fague, the attorney who drew this agreement for dissolution, testified that the elder Mr. Smith said at the time that he did not want his wife to know about it. In view of his then suspicion that his wife was attempting to poison him, the reason is not far to seek why this paper was executed. In a very short time Mr. Smith had to be taken to a sanitorium, and this same

son received from him a power of attorney. In his testimony he was compelled to admit that he transacted his father's business under this power of attorney during the months of January, February, March, April, and May, 1902. Indeed, he admitted that on May 13, 1902, the day before the execution of the deed herein, he signed a check or note for $400 under the authority of his power of attorney, and that he was then acting as his father's attorney in fact; that on May 31, 1902, he signed a note for $700 as his father's attorney in fact; that as late as July, 1902, he was compelled to exhibit his power of attorney to the railroad company before the company would pay over to him $30 as damages for injury to a cow belonging to his father. Notwithstanding that he sustained a fiduciary relation to his father, whom he must have known was and had been for a long time utterly unfit to transact business, we find him obtaining from his father on the 14th and 15th of May, 1902, the deed and bill of sale set aside. He admits that in this transaction, as in the transaction of September 21, 1901, no money passed. He says he assumed a $1,500-encumbrance on the real estate, and surrendered other notes to his father for the balance. The testimony as to the consideration for these notes is as unsatisfactory as it was as to those of the prior transaction. He contends that the real estate was not worth more than $2,450, the consideration named in the deed, and that $1,000, the consideration named for the father's half of the milk business, was the fair value of that interest in the business. He admits, however, that he was then renting the real estate for $30 per month, which is some indication that the property was worth more than the consideration named in the deed.

Mr. Fague testified that he was representing both parties when he drew the deed and bill of sale of May 14th and 15th, but, be that as it may, he subsequently acted as counsel for Frank W. Smith in these proceedings. He further testified that, when the deed and bill of sale were executed, there was found to be $35.64 due Frank, and that Mr. Smith thereupon said: "Frank has been attending to my business for some time back, and he has attended to it faithfully; he has been a good

boy to me, so just draw up a note for $100 at three months and the difference between $35.64 and the $100 I wish to give him as compensation for looking after my interests, and I consider that $300 would not be enough." The witness said: "That is verbatim. I then drew up the note."

The court below, after setting aside these papers, and ordering an accounting, authorized the auditor to "subrogate the defendant, Frank W. Smith, to the rights of lienors if it shall appear that said defendant has removed or abated any lawful liens or encumbrances thereon since the 14th day of May, 1902; and, further, the auditor in such accounting shall treat and consider the two promissory notes and other obligations of the complainant, Henry S. Smith, mentioned in this cause, so far as the same are alleged to have been a part of the consideration of said deed and bill of sale, as evidences of obligation between the parties as of the said May 14th, 1902, subject to all equities and defenses which could or might have been urged on behalf of said complainant against the same as of said date."

*Mr. Joseph R. Fague, Mr. Andrew Wilson,* and *Mr. Noel W. Barksdale* for the appellants.

*Mr. James B. Archer, Jr.,* and *Mr. Jno. Lewis Smith* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

The only question necessary to determine is whether Henry S. Smith, at the time of the execution of the papers in question, possessed sufficient intelligence to understand fully the nature and effect of each transaction, and, if so, whether the papers were executed under such circumstances as warrant their being upheld, or as would justify the interference of equity for their cancelation. *Allore v. Jewell,* 94 U. S. 508, 24 L. ed. 262.

This court in *Moran v. Sullivan,* 12 App. D. C. 137, through Mr. Justice Morris, stated that it is "well settled, by repeated decisions of courts of equity in England and America, that when, at the time of any given transaction, a fiduciary or confidential

relation is shown to have existed between the parties, and the opportunity for the exercise of undue influence is shown to have been present in the relation and circumstances of the parties, and the one in the superior position of being able to exercise the influence has in fact procured a benefit to himself from the other, a court of equity will not allow the benefit to stand without clear and satisfactory proof of the entire fairness of the transaction. 2 Pom. Eq. Jur. sec. 956; 27 Am. & Eng. Enc. Law, title *Undue Influence,* where the authorities on the subject are cited."

And in *Holtzman* v. *Linton,* 27 App. D. C. 241, 256, Mr. Chief Justice Shepard observed: "It must be remembered that, when fiduciary relations exist between grantor and grantee, the fiduciary is under a plain moral duty not to put himself in any situation which would tend to excite a conflict between his self-interest and his duty to his client, principal, or obligee, of whatsoever nature. *Michoud* v. *Girod,* 4 How. 503, 554, 11 L. ed. 1076, 1099; 2 Pom. Eq. Jur. sec. 956."

In the present case it is clear that both incapacity and fiduciary relationship are established.

It is, we think, equally clear that this son in the several transactions hereinbefore detailed, which he had with his father and which the court set aside, was acting primarily in his own, and not in his father's, interests. The record discloses that in each transaction the son benefited, but it fails to disclose wherein the father received any benefit from either transaction. The son absorbed the father's interest in the dairy business and in the piece of real estate, and in return surrendered certain notes which he says his father had theretofore given him for borrowed money. But in the last transaction he accepted another note from his father for $100 when, according to his attorney's statement, only $35.64 was due him.

We conclude, therefore, that the mental condition of his father at the time of the execution of these papers, the relation he sustained to his father, his lack of candor as a witness, and the suspicious circumstances surrounding each transaction, fully justify the decree of the court below.

The decree entered was right, and will therefore be affirmed, with costs.                                   *Affirmed.*